UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

TRESA M. RICHARDSON,           )
                               )
                Plaintiff,     )
                               )
        v.                     )      No. 2:07 CV 17 DDN
                               )
MICHAEL J. ASTRUE, Commissioner )
of Social Security,            )
                               )
                Defendant.     )

## MEMORANDUM

This action is before the court for judicial review of the final decision of defendant Commissioner of Social Security terminating Tresa Richardson's receipt of disability insurance benefits and supplemental security income under Title II and Title XVI of the Social Security Act (the Act), 42 U.S.C. §§ 401, et seq., and 1381, et seq. The parties have consented to the exercise of plenary authority by the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). (Doc. 7.) For the reasons set forth below, the ALJ's decision is reversed and remanded.

## I. BACKGROUND

Plaintiff Tresa M. Richardson was born on November 9, 1964. (Tr. 71.) She is 5'8" tall, with a weight that has ranged from 220 pounds to 257 pounds. (Tr. 139, 254.) She received a GED, and can read and write English. (Tr. 279-83, 287-88.) She last worked as a bartender in 1990. (Tr. 268.)

On September 15, 1990, Richardson began receiving disability insurance benefits and supplemental security income, as a result of depression and a personality disorder with borderline and histrionic traits. (Tr. 71.) On September 25, 2003, the Commissioner determined that Richardson's health had improved, and that she was able to work. Her benefits ended on November 30, 2003.[1] (Tr. 50-53, 71.) Richardson

_____

[1]Richardson elected to continue receiving benefits during the appeal process, and was still receiving benefits at the time of the hearing.
(continued...)

appealed this decision, and on January 22, 2004, the Commissioner affirmed his decision. (Tr. 57-58, 72, 80-82.) After a hearing on May 23, 2005, in Salem, Oregon, the ALJ denied benefits on October 14, 2005. (Tr. 8-28, 294-324.) On January 25, 2007, the Appeals Council denied plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 3-5.)

## II. MEDICAL HISTORY

In an undated report, Richardson noted her work background. From 1988 to 1990, she worked as a bartender at three different bars, in Honolulu, Hawaii. She was fired from each job. From April to May 2004, she worked at Dick Jordan Realty, where she performed light cleaning. She had to quit working because her back pain prevented her from doing her job. (Tr. 268.)

On January 26, 2001, Richardson went to the emergency room after she was found sitting outside a bar, drunk. The doctors noted alcohol intoxication, vomiting, and a head contusion from falling. There were superficial abrasions on both knees, and a golf-ball size bump on the back of her head. The doctors noted a history of frequent alcohol use. She had no suicidal ideation, no major depression, and no other apparent complications. Richardson refused to be x-rayed. A CT scan of her head showed no hemorrhaging. (Tr. 136-40, 155.)

On January 29, 2001, Dr. Timothy Raleigh, D.O., diagnosed Richardson with lower back pain. The pain started a few days earlier, when Richardson fell down while intoxicated. The pain was sharp, acute, and radiating, 6/10. Movement exacerbated the symptoms, while remaining still provided relief. A physical examination showed Richardson was alert, and in mild distress. Diagnostic imaging of Richardson's lumbar spine revealed the vertebral bodies were well-aligned, except for

---

[1](...continued)
(Tr. 67, 302.)

-2-

straightening of the lordotic curvature.[2]  There was narrowing of the L5-S1 intervertebral disk space, but the remaining disk spaces were well-maintained.  There was no evidence of spondylolisthesis or spondylolysis.[3]  Dr. Raleigh noted Richardson suffered from multiple personalities, and prescribed Darvocet, Naprosyn, and Flexeril.[4]  (Tr. 130-34, 157-58.)

On January 20, 2002, Richardson went to the emergency room, complaining of depression and agitation for the past two days.  She had gotten in a fight the day before, and was having thoughts of harming others.  She reported drinking six beers the night she was admitted.  The doctors noted a past history of suicide attempts, psychiatric problems, depression, and bipolar disorder.  A mental examination showed she was slow and hostile, with a depressed affect.  She was diagnosed with major depression.  Richardson left the hospital with her boyfriend, Robert Forshee, without telling anyone.  The hospital called her at home, and instructed her to return to the emergency room if she had any problems or felt she was going to harm herself or others.  (Tr. 123-28, 135.)

On February 15, 2002, Richardson saw Dr. David Knorr, complaining of chronic dislocation and weakness in her left shoulder.  She was oriented, alert, and her speech was clear and appropriate, though she was

---

[2]The human spinal column consists of thirty-three vertebrae.  There are seven cervical vertebrae (denoted C1-C7), twelve thoracic vertebrae (denoted T1-T12), five lumbar vertebrae (denoted L1-L5), five sacral vertebrae (denoted S1-S5 and fused together into one bone, the sacrum), and four coccygeal vertebrae (fused together into one bone, the coccyx).  The cervical vertebrae form part of the neck, while the lumbar vertebrae form part of the lower back.  The sacrum is immediately below the lumbar vertebrae.  Stedman's Medical Dictionary, 226, 831, 1376, 1549, 1710, Plate 2 (25th ed., Williams & Wilkins 1990).
     Lordosis is an abnormal extension deformity - usually in the form of a backward curvature of the spine.  Id., 894.

[3]Spondylolisthesis is the forward movement of the body of one of the lower lumbar vertebrae on the vertebra below it, or upon the sacrum.  Stedman's Medical Dictionary, 1456.  Spondylolysis is degeneration of the articulating, or joining, part of a vertebra.  Id., 1456.

[4]Darvocet and Naprosyn are used to treat mild to moderate pain.  Flexeril is a muscle relaxant and is used with rest and physical therapy to decrease muscle pain and spasms.  http://www.webmd.com/drugs. (Last visited August 14, 2008).

anxious.  After she complained of claustrophobia, Dr. Knorr sedated Richardson so he could obtain an MRI.  An earlier MRI was unclear, but Dr. Joel David Hassien, M.D., believed it revealed an anterior cartilaginous glenoid labral tear.[5]  Richardson had a steady gait and very little sedative effect after the procedure.  (Tr. 120-22, 154.)

On June 11, 2002, Scott Reeves, a licensed clinical social worker, completed an initial mental health assessment of Richardson.  She had been referred by the Yamhill County Courthouse.  Richardson reported a long history of mental health treatment over the past ten years, starting when she was 27.  But even before that, she noted suicide attempts and self-mutilating behavior.  She estimated that she had been hospitalized twelve times, usually voluntarily, but once under commitment.  One hospitalization came after a suicide attempt playing Russian Roulette.  She viewed the hospital as a place to "go and rest."  She was last hospitalized in a state hospital for three months, because she was hearing, seeing, and smelling things that were not there.  Richardson had been taking her medication for the past ten years, and was only off her medication when she did not have insurance or could not afford it.  She had recently moved to Oregon from Missouri, where she had been seeing Dr. Gadson, a psychiatrist, for six years, for medication management, but not counseling.  Richardson noted suffering from arthritis, back problems, stomach problems, hypothyroidism, and diverticulitis.[6]  (Tr. 163.)

Richardson noted drinking several beers on the weekends, getting in trouble because of alcohol, and having people tell her she had a problem with alcohol.  Reeves noted there was a possibility "she would meet [the] criteria for alcohol abuse."  When she was 14 years old, the state removed Richardson from her mother's custody, citing mental and physical

---

[5]The glenoidal labrum is a ring of cartilage attached to the shoulder joint, which increases its depth.  Stedman's Medical Dictionary, 832, 1386.

[6]Hypothyroidism is the diminished production of thyroid hormone, leading to thyroid insufficiency, which is characterized by a low metabolic rate, a tendency to gain weight, a strong desire for sleep, and sometimes myxedema, a skin disorder.  Stedman's Medical Dictionary, 755, 1020.  Diverticulitis is an inflammation of the small pockets in the wall of the colon.  Id., 460.

abuse.  Her father died when she was 17 years old, and she later ran away from her foster home.  She said she was sexually abused by her uncle and a babysitter.  Much later, Richardson moved back in with her mother, but left after a few days.  She last worked when she was 24 years old, and has been on disability since 1991.  She did not have any friends, and described her boyfriend as her only ally.  (Tr. 164-65.)

Richardson was overweight, and wore clean and casual clothing.  Her mood was depressed, with a full range of affect.  She had a long history of suicidal thoughts and suicide attempts.  Her last suicidal thought was two days earlier, in which she tried to talk her boyfriend into "making a suicide pact."  Three weeks earlier, she had thought about hanging herself.  She often cut herself because that calmed her down.  She had psychotic symptoms and manic phases.[7]  Reeves found she was oriented, and had good concentration, good general knowledge, and abstract thinking. Her judgment was fair to poor, and her insight was fair.  She was bipolar, with manic episodes, depressed, and had post-traumatic stress disorder, with nightmares and flashbacks from childhood sexual abuse. She rated her depression as 3/10.  She also had dissociative identity disorder, and counted five alternate personalities.[8]  (Tr. 165-66.)

Richardson had several sources of stress in her life.  She was essentially homeless, had no car, was facing legal charges, had recently

---

[7]Psychosis is a mental disorder causing gross distortion or disorganization of a person's mental capacity, affective response, and capacity to recognize reality, communicate, and relate to others.  The disorder interferes with the individual's capacity to cope with the ordinary demands of everyday life.  Stedman's Medical Dictionary, 1286.
    Mania is an emotional disorder characterized by euphoria, increased psychomotor activity, rapid speech, flight of idea, decreased need for sleep, distractability, grandiosity, and poor judgment.  It usually occurs in bipolar disorder.  Id., 919.

[8]Dissociative identity disorder, formerly multiple personality disorder, is the presence of two or more distinct identities or personality states that recurrently take control of behavior.  The disorder reflects a failure to integrate various aspects of identity, memory, and consciousness.  Diagnostic and Statistical Manual of Mental Disorders, 526-29 (4th ed., American Psychiatric Association 2000).

been hospitalized for diverticulosis, and her dog had cancer.[9]  The legal
charges stemmed from an assault on her mother.  Reeves diagnosed
Richardson with post-traumatic stress disorder, bipolar disorder, and
dissociative identity disorder, and assigned her a GAF score of 31.[10]  She
was scheduled to see Dr. Arnold.  (Tr. 166-67.)

On June 12, 2002, Dr. J.B. Arnold, M.D., a consulting psychiatrist,
examined Richardson.  Richardson was slightly overweight, casually
dressed, with acceptable hygiene.  She was friendly when the interview
began, but became increasingly angry and hostile as the interview
progressed.  The hostility advanced to verbal abuse and profanity
directed against Dr. Arnold.  Richardson's responses devolved into brief,
one- or two-word responses, which made it difficult to obtain information
that was relevant to her mental symptoms.  Dr. Arnold found her
intellectual functioning was in normal range and she had no deficiencies
in memory.  Her affect was hostile and her judgment was difficult to
test.  Dr. Arnold diagnosed Richardson with dissociative identity
disorder, bipolar disorder, major depression, adjustment disorder with
mixed emotional and behavioral features, and assigned her a GAF score of
40.[11]  Dr. Arnold found her reports of depression and anxiety credible,

---

[9]Diverticulosis is the presence of a number of pouch or sac openings
in the intestine, common for middle age.  Stedman's Medical Dictionary,
460.

[10]A GAF score, short for Global Assessment of Functioning, helps
summarize a patient's overall ability to function.  A GAF score has two
components.  The first component covers symptom severity and the second
component covers functioning.  A patient's GAF score represents the worst
of the two components.  On the GAF scale, a score of 31 means there is
impairment in reality testing or communication (such as speech that is
at times illogical, obscure, or irrelevant), or major impairment in
several areas, such as work or school, family relations, judgment,
thinking, or mood (such as depressed, avoids friends, neglects family,
and is unable to work).  A score of 31 represents worse than serious
symptoms.  Diagnostic and Statistical Manual of Mental Disorders, 32-34.

[11]A GAF score of 40 shares the same characteristics as a GAF score
of 31.  See footnote 9, above.

and prescribed Celexa and Navane.[12]  At the time, Richardson was also taking Levoxyl.[13]  Dr. Arnold requested that Richardson return in a month's time, but she indicated she did not want to see Dr. Arnold again. In leaving her appointment, Richardson told Dr. Arnold to "go f--- yourself." (Tr. 159-62.)

On July 11, 2002, Richardson missed her appointment with Dr. Holly Hoch, M.D., a consulting psychiatrist. (Tr. 173.)

On August 26, 2002, Richardson saw Dr. Hoch for the first time. Richardson described a history of manic episodes with significant psychotic symptoms that required hospitalization. She was doing well in the weeks that she has been off Lithium, but noted that her moods had become more erratic.[14]  Richardson did not get continuing counseling because of where she lived and because her car was unreliable. Dr. Hoch found Richardson was appropriately dressed and groomed, polite, and cooperative with the exam. Her affect was euthymic, but she appeared stressed.[15]  She denied suicidal ideation, homicidal ideation, or psychotic symptoms. Her thought process was organized and linear. Dr. Hoch restarted Richardson on Lithium, and continued her on Citalopram and Navane.[16] By her history, Dr. Hoch diagnosed Richardson with dissociative disorder and bipolar disorder.  She also diagnosed Richardson with

---

[12]Celexa is used to treat depression.  Navane is used to treat schizophrenia and other mental disorders.  http://www.webmd.com/drugs. (Last visited August 14, 2008).

[13]Levoxyl, or Levothyroxine, is used to treat hypothyroidism. http://www.webmd.com/drugs. (Last visited August 14, 2008).

[14]Lithium is used to treat manic-depressive disorder or bipolar disorder.  It works to stabilize the mood and reduce extremes in behavior.  http://www.webmd.com/drugs. (Last visited August 14, 2008).

[15]Euthymia refers to a state of joyfulness, mental peace, and tranquility.  Stedman's Medical Dictionary, 545.

[16]Citalopram is an anti-depressant used to treat depression. http://www.webmd.com/drugs. (Last visited August 14, 2008).

recurring major depression and adjustment disorder with mixed emotional and behavioral features, and assigned her a GAF score of 50.[17] (Tr. 172.)

On November 25, 2002, Richardson saw Dr. Hoch. Richardson had recently missed an appointment because of car trouble. She had been out of her thyroid medication for the previous two months. She also complained of feeling sluggish and tired all the time. She said her mood was fairly good, albeit tired. She thought the Thiothixene was very helpful.[18] Her biggest concern was being "crazy" and needing to be hospitalized. Dr. Hoch noted Richardson appeared tired, but that her affect was otherwise euthymic. She denied any suicidal ideation, homicidal ideation, or psychotic symptoms. Her thought process was organized and linear. Dr. Hoch believed her history was consistent with bipolar disorder, mania, and psychosis. Dr. Hoch told Richardson she needed to find a primary care physician. Her diagnosis and GAF score were unchanged since the last visit. (Tr. 171.)

On January 7, 2003, Richardson met with Dr. Hoch. Richardson reported that she was doing well, her mood had been good, and she was not suicidal. She was keeping a fairly good outlook, even though her circumstances were difficult. She reported feeling tired all the time, and sleeping for up to twenty hours a day. She had still not arranged for a primary care physician. Dr. Hoch found her mood was pretty good and her affect congruent. She denied any suicidal ideation, homicidal ideation, self-mutilating behavior, or psychotic symptoms. Her speech was within normal limits, and her thought process was linear. Dr. Hoch continued Richardson on her current medications, "as her depressive symptoms seem to be well treated." Dr. Hoch thought Richardson's hypothyroidism might be the source of her fatigue. There was no evidence

---

[17]On the GAF scale, a score of 50 represents serious symptoms (such as thoughts of suicide, severe obsessional rituals, frequent shoplifting), or any serious impairment in social, occupational, or school functioning (such as the inability to make friends or keep a job). Diagnostic and Statistical Manual of Mental Disorders, 32-34.

[18]Thiothixene is an anti-psychotic used to treat certain mental and mood disorders, such as schizophrenia. http://www.webmd.com/drugs. (Last visited August 14, 2008).

of mania since she stopped taking Lithium.  Dr. Hoch's diagnosis and GAF score remained unchanged.  (Tr. 170.)

On February 18, 2003, Richardson missed her appointment with Dr. Hoch.  (Tr. 169.)

On April 16, 2003, Richardson saw Dr. Hoch.  Dr. Hoch found Richardson was appropriately dressed and groomed.  She had a good mood, her affect was euthymic, her speech was within normal limits, her thought process was linear, and she had no suicidal ideation, homicidal ideation, or psychotic symptoms.  Dr. Hoch noted that Richardson had been hospitalized in August 1995, after becoming agitated and violent.  While hospitalized, she became delirious, crawled on the floor, and reported hallucinations.  Dr. Hoch found Richardson suffered from post-traumatic stress disorder, major depression, alcohol dependence in remission, and dissociative disorder by history.  Reviewing Richardson's hospital records, Dr. Hoch thought the past diagnosis of bipolar disorder was less likely.  She assigned Richardson a GAF score of 50.  At the time, Richardson was taking Citalopram, Thiothixene, and Thyroid.[19]  (Tr. 168.)

On May 7, 2003, Richardson completed a report of continuing disability.  She was receiving benefits because she suffered from bipolar disorder, dissociative disorder, and post-traumatic stress syndrome. These conditions produced anger and violence.  Richardson also stated that she needed surgery for incontinency and a chronically dislocated shoulder.  Richardson would take her dog for short walks and did not need any help with personal needs or grooming.  Her boyfriend did the household cleaning because her back was bad from the surgeries. Richardson did not have any social contacts – people made her angry.  She noted being physically abused by her mother, and removed from her custody.  Richardson was arrested in April 2002, for assault.  She was becoming "increasingly violent and angry [and] rather than cutting myself or attempting suicide, I act out."  Since meeting her boyfriend, she was not blacking out as often or switching personalities.  He kept her calm. (Tr. 30-36.)

_____

[19]Thyroid is used to treat hypothyroidism. http://www.webmd.com/drugs. (Last visited August 14, 2008).

On June 5, 2003, Robert Forshee, Richardson's boyfriend, completed a third-party function report. He noted spending a lot of time with Richardson, mostly watching television. When her mood was up, or manic, she did bead work, painted, and wrote poetry. When her mood was down, or depressed, she slept all day and did not eat. Richardson did not take care of anyone else or take care of pets. She even had trouble caring for herself. She did not brush her hair and would wet herself. She needed to be reminded to take her medication and needed help preparing meals. Richardson also had a bad back, having had three past surgeries. She rarely went outside, and did not drive. Once a month she went out to buy groceries. Her hobbies were reading, watching television, and beading. Reading was difficult because she had a short attention span. She did not socialize, and had trouble getting along with anyone in her family. (Tr. 40-45.)

Forshee noted Richardson's impairments affected her ability to lift, squat, bend, stand, reach, kneel, climb stairs, remember things, complete tasks, concentrate, follow instructions, and get along with others. She could walk eight blocks before having to rest for fifteen minutes. She could follow instructions, but had trouble finishing what she started. She did not get along with others, including authority figures. She had not kept a job for longer than six months. She handled stress and changes in her routine badly. Forshee had taken Richardson to the hospital several times because of psychotic behavior. Richardson was separated from her entire family, did not get along well with Forshee's family, and could associate with people only in a superficial way. (Tr. 45-48.)

On June 7, 2003, Richardson saw Dr. Francisco L. Arroyo, M.D., complaining of incontinence, with or without stress. She did not have a fever, chills, or pain. Dr. Arroyo referred Richardson to Dr. Pieper for further evaluation, and a gave her a prescription for her thyroid medication. (Tr. 208-09.)

On July 11, 2003, Richardson saw Dr. Kevin L. Pieper, M.D., complaining of incontinence. A physical examination showed Richardson was alert and in no apparent distress. She had no lesions on her cervix

or vagina.  Richardson opted for surgery to solve her incontinence.  At the time, she was taking Celexa, Navane, and Levoxyl.  (Tr. 204-08.)

On July 29, 2003, Dr. Hoch saw Richardson for an annual comprehensive psychiatric assessment.  Richardson suffered from nightmares, flashbacks, hypervigilance, and avoidance because of sexual abuse as a child.  She also suffered from feelings of depression, low energy, social withdrawal, poor concentration, outbursts of anger, irritability, and suicidal thoughts.  Dr. Hoch noted that these "symptoms have all been relatively well controlled over the past year with Thiothixene and Citalopram.  There has been no evidence of mania or psychosis over the past year and she has not brought up issues of [alternate personalities] or dissociation."  Richardson was doing relatively well since her last appointment with Dr. Hoch, but was still having problems sleeping.  She had hypothyroidism and diverticulitis. She denied abusing alcohol or drugs at the time of the visit.  (Tr. 224.)

A mental examination showed Richardson was casually dressed, appropriately groomed, and in no acute distress.  She was polite, cooperative, with speech within normal limits.  Her mood was up and down, her affect euthymic, and her cognition intact.  She was alert and oriented, her thought process was organized, and she had no suicidal ideation.  She had no psychotic symptoms, and her judgment appeared to be intact.  Dr. Hoch diagnosed Richardson with borderline personality disorder, periods of depression, and post-traumatic stress disorder related to a history of sexual abuse as a child.  For the past year, "she has been relatively stable on her current medication regimen and this has been aided by being in a stable relationship.  She has not, however, continued in individual therapy, which would likely be beneficial and I think essential, if symptoms should recur or worsen."  Dr. Hoch assigned Richardson a GAF score of 50, and advised her to continue taking Citalopram and Thiothixene.  Richardson was also taking Trazodone.[20]  (Tr. 225-26.)

---

[20]Trazodone is used to treat depression.  http://www.webmd.com/drugs. (Last visited August 14, 2008).

On September 22, 2003, Dr. Dorothy Anderson, Ph.D., completed a Social Security Administration review form. Dr. Anderson believed Richardson suffered from mild restrictions in daily living activities, mild difficulties in maintaining concentration, persistence, and pace, and moderate difficulties in maintaining social functioning. There was insufficient evidence to determine whether Richardson suffered from any extended episodes of decompensation. Dr. Anderson, a consultant, found Richardson's statements were not entirely consistent with the medical evidence. Richardson claimed her symptoms produced anger and violence, but she was pleasant and cooperative at her medical visits. Dr. Anderson believed "the medical evidence in [the] file does not indicate socialization problems severe enough to prevent work like activity." She based this conclusion on Richardson's visits with Dr. Hoch. (Tr. 174-87.)

On September 22, 2003, Dr. Anderson completed a functional capacity assessment for Richardson. She found Richardson was either not significantly limited or only moderately limited in every category of understanding and memory, sustained concentration and persistence, social interaction, and adaptation. She did not find Richardson markedly limited in any area of functioning. Dr. Anderson concluded Richardson would be able to understand, remember, and carry out simple instructions, and maintain attention and concentration for simple, repetitive tasks. Richardson would not respond well to criticism, or be able to work closely with or in proximity to others. She would need to limit her contact with the general public and would need help in setting realistic goals. (Tr. 190-92.)

On September 26, 2003, Richardson received a letter concerning the cessation of her disability benefits. The letter upset Richardson, and she cut her forearm and swallowed ten pills of Celexa.[21] She was diagnosed with a lacerated forearm, bipolar disorder, post-traumatic stress disorder, and a mild degree of mania with psychotic features. This was the first time she had significantly hurt herself in two years.

---

[21]One medical report states she swallowed ten pills. (Tr. 194.) Another medical report states she swallowed twenty pills. (Tr. 200.)

-12-

The examining doctor found Richardson had a severe impairment due to anger issues, and moderate impairments in sleeping, mood and depression, social withdrawal, delusions, hallucinations, motivation, and judgment. She had no friends, had phobias, claimed people from outer-space visited her, and had been to anger management. She had mild or no impairments in appetite, feelings of worthlessness, thought processes, obsessions, impulse control, and insight. All her labs were within normal limits. At the time, she was taking Celexa, Levoxyl, and Thiothixene. The doctors called social services to arrange for psychiatric screening. After conducting a psychiatric risk assessment, the screener believed Richardson was not acutely suicidal, and that her actions were "more of a call for help or attention . . . ." Richardson was discharged home, in stable condition. (Tr. 194-95, 200-03.)

On October 8, 2003, Richardson saw Dr. Ricardo R. Carlon, M.D., complaining of a left earache. She did not have a fever, runny nose, or sore throat. She did not have shortness of breath or chest pain. A physical examination showed her back was tender to palpation in the midline and lumbar sacral spine. Her motor strength was 5/5 in the lower extremities. Dr. Carlon diagnosed Richardson with left otitis and chronic back pain.[22] He prescribed Ibuprofen and Cortisporin.[23] (Tr. 198-99.)

On October 17, 2003, Richardson complained of lower back pain for the previous three weeks, radiating to her right thigh. Prolonged standing exacerbated the pain. Richardson also complained of epigastric pain. She was hypothyroid, and had recently undergone bladder suspension. A physical examination showed no significant tenderness in her back. Richardson was diagnosed with bipolar disorder, post-traumatic stress disorder, hypothyroidism, and chronic lower back pain. She was encouraged to lose weight. (Tr. 216-18.)

---

[22]Otitis is inflammation of the middle ear. Stedman's Medical Dictionary, 1112.

[23]Ibuprofen is an anti-inflammatory drug used to relieve pain and swelling. Cortisporin is used to treat ear infections. http://www.webmd.com/drugs. (Last visited August 14, 2008).

On October 21, 2003, Richardson completed a reconsideration report for disability cessation. She listed her disabling conditions as bipolar disorder, dissociative disorder, and post-traumatic stress syndrome. She also suffered from two ruptured disks and three back surgeries. She was unable to bend, lift, or stand for more than fifteen minutes. She could not handle any form of stress. She heard voices, felt under pressure, forgot conversations, slept too much, went without bathing and eating, had manic episodes that would last for months, and engaged in self-mutilation when under stress. Richardson thought she was still capable of violence or suicide attacks. She had started smoking and had thyroid disease. She could not lift more than ten pounds, and her back problems made it difficult to stand. Her boyfriend helped with her grooming – brushing her hair and reminding her to change her underwear. Her boyfriend also helped her cook, and took her shopping – usually in the early morning to avoid contact with too many people. Richardson thought she was doing better than previously, but still believed she remained a danger to herself and others. She had been able to cope recently by insulating herself from the outside world and withdrawing from people altogether. (Tr. 59-64, 69.)

On October 29, 2003, Dr. Hoch and Dr. Bruce S. Neben, LPC, Psy. D., wrote a letter to the Social Security Administration, detailing Richardson's psychiatric history. Drs. Hoch and Neben had been treating Richardson since June 2002, and had diagnosed her with recurrent, moderate major depressive disorder, post-traumatic stress disorder, alcohol dependence, dissociative disorder, and bipolar disorder. They had assigned her a GAF score of 50. Because of her depression, Richardson suffered from a loss of interest in daily activities, appetite disturbance, sleep disturbance, decreased energy, feelings of worthlessness, difficulty concentrating and thinking, thoughts of suicide, hallucinations or delusions, and hypomanic symptoms. The doctors noted several examples of Richardson's impairments. In September 2003, Richardson cut her wrists and ingested a bottle of her anti-depressants. In June 2003, she went three days without sleeping, and cleaned excessively. In June 2002, she believed she was having a telephone conversation with a woman in Russia. In April 2002, she

assaulted her mother, and then tried to hang herself. Richardson's impairments created difficulties for her in life. She neglected housework, did not get dressed sometimes, and would not bathe. She was irritable and did not socialize with others, fearing she might become violent. Richardson last worked in 1991 as a bar manager, before being fired. (Tr. 222-23.)

On October 31, 2003, David Blanchard, a former employee of Richardson's father, described the Richardson family as "a seriously dysfunctional family." Richardson's father had died when she was a teenager, and the family dynamic disintegrated during her teenage years. The family relationships had not normalized since. Indeed, there was a restraining order between Richardson and her mother. Blanchard noted that Richardson had been in a state of depression and confusion, with suicidal tendencies, for most of her adult life. (Tr. 75.)

On December 10, 2003, Dr. Martin Kehrli, M.D., completed a physical residual functional capacity assessment for Richardson. His diagnosis was a laminectomy and advanced degeneration at L5-S1.[24] Dr. Kehrli found Richardson could occasionally lift twenty pounds, frequently lift ten pounds, and sit, stand, and walk for six hours in an eight-hour workday. She could perform unlimited pushing and pulling, but could only occasionally climb stairs, stoop, kneel, crouch, or crawl. She did not have any manipulative, visual, or communicative limitations. She needed to avoid exposure to vibrations and hazards because of her back and her history of alcohol abuse. In reaching these conclusions, Dr. Kehrli relied on a CT scan of Richardson's lumbar spine from January 1996. That scan revealed a laminectomy at L5-S1 with minimal scarring near the lateral recess around the right S1 nerve and advanced degeneration at L5-S1. Another medical report from April 1998, indicated diffuse arthralgias.[25] Dr. Kehrli found Richardson was not entirely credible because her alleged diagnoses were not contained within the medical

_____

[24]A laminectomy is a surgery to excise a vertebral plate, usually the posterior arch. Stedman's Medical Dictionary, 839.

[25]Arthralgia is severe joint pain, but not inflammatory. Stedman's Medical Dictionary, 134.

-15-

record, and because of improvements in her medical health from her medications. (Tr. 227-34.)

On December 12, 2003, Linda Rinehart completed a vocational decision worksheet. Richardson had no past relevant work, had postural and environmental limitations, and could only perform light physical exertion. She had problems with understanding and memory, concentration and pace, social interaction, and adaptation. With these limitations, Rinehart believed Richardson could perform work as an addresser, a worm packer, or a bead picker. (Tr. 79.)

On January 22, 2004, Denise Vermilyea, a disability hearings officer, found Richardson was not disabled. Vermilyea began by summarizing Richardson's testimony. Richardson stated that she had not had a manic psychotic episode since 1997, but that three to four times a year she had two-week periods in which she would not sleep, shower, eat, or change her clothes. The rest of the year she was able to take care of these tasks. Richardson was not able to stand or walk for longer than fifteen minutes, but could sit for a long time in a comfortable chair. She was no longer having problems with incontinence. Vermilyea also summarized Richardson's medical history, noting several psychiatric visits and evaluations. Vermilyea believed there was an inconsistency between Richardson's medical progress notes and the ultimate medical conclusion from an October 2003 letter from her treating doctor. Vermilyea concluded that Richardson was not entirely credible, and that the treating source letter was not based on clinical observations, but only Richardson's subjective reports. (Tr. 86-88.)

Taken together, Vermilyea concluded that Richardson had made significant medical improvement. Her mood was stable, and she no longer suffered from hallucinations and delusions. Richardson still suffered from some mental impairments, which produced slight limitations on her daily activities, and moderate limitations on her social functioning, and her concentration, persistence, and pace. She had the ability to understand, remember, and carry out simple instructions without inordinate supervision, and was capable of interacting with supervisors and co-workers if she did not have to coordinate her efforts with their efforts. She could not interact with the general public and would need

-16-

a work setting with well-established routines. From a physical standpoint, Vermilyea found Richardson's complaints of back pain reasonably credible. She found Richardson could stand or walk for two hours in an eight-hour workday, but could sit for unlimited periods. She could frequently lift up to ten pounds. Vermilyea concluded that Richardson could not perform her past relevant work, but that she could perform work as an addresser, a final assembler, or a smoother. She was not, therefore, disabled. (Tr. 88-94.)

On January 24, 2004, Vermilyea completed a report of the disability hearing. The report included some of Richardson's testimony. At the time of the hearing, Richardson was taking Celexa, Thiothixene, and Seroquel.[26] She experienced dizziness, restless legs, and the sensation of ants crawling on her body from the anti-psychotics. She stopped taking Lithium because of thyroid problems. She also took Ibuprofen and Zantac.[27] Richardson had pain in her back. The pain was present every day and was worst in the morning. She had undergone two back surgeries and one surgery on her abdomen to take weight off her stomach and relieve the pressure on her back. Richardson did not do any housework because of her back pain. She could not type because of past carpal tunnel surgery. During the surgery, the doctors cut the nerve in her hand, and she no longer had feeling in the two middle fingers of her right hand. When manic, Richardson had a hard time making decisions and finishing things. She also had panic attacks and got stressed out easily. As a condition of her probation, she no longer drank. Richardson's last job was as a bar manager. She worked there for a year, and was in charge of the inventory. As part of the job, she stood all day and lifted kegs and cases of beer. Before that, she worked as a bartender for six months. Before that, she worked as an exotic dancer for ten years. (Tr. 95-101.)

---

[26]Seroquel is used to treat certain mental or mood conditions, such as bipolar disorder or schizophrenia. http://www.webmd.com/drugs. (Last visited August 14, 2008).

[27]Zantac, or Ranitidine, is used to treat stomach ulcers. http://www.webmd.com/drugs. (Last visited August 14, 2008).

On January 28, 2004, Richardson requested a hearing before an Administrate Law Judge. She believed she was still unable to work because of her back and psychiatric problems. (Tr. 102-03.)

On February 24, 2004, Richardson completed a disability report appeal. She could not bend, lift, or stand for more than fifteen minutes. She could not cope with any form of stress without going through emotional outbursts and hurting herself. She was taking large amounts of Ibuprofen, and was experiencing alternating periods of depression and mania, that the anti-psychotic and anti-depressant medications could not control. (Tr. 105-11.)

On March 9, 2004, Richardson saw Dr. Hoch, complaining of significant stress and sleep difficulties. She also noted a restless feeling in her legs. A mental examination showed Richardson was casually dressed and neatly groomed. Her affect was calm and mildly dysphoric.[28] She felt frustrated that she was being punished for managing to cope, and described her mood as "stressed." She did not have any specific suicidal ideation. Her thought process was organized. (Tr. 253.)

On March 10, 2004, Richardson saw Dr. Helge R. Berg, M.D., complaining of lower back pain. The pain had started four hours earlier, after she woke up. Richardson had not fallen, and the pain did not radiate. She did not have any weakness in the legs, or any bowel or bladder control problems. She did not have a fever, vomiting, or diarrhea. A physical examination showed Richardson was shaking and uncomfortable. Her range of motion was quite limited, and she was barely able to stand up once seated. Initially, she was unable to perform heel and toe walking because of the pain. But after a pain shot, she was able to heel walk well, but not toe walk. She had no atrophy or edema in the lower limbs, and her circulation and sensation were intact.[29] There was no evidence of neurologic findings, and Dr. Berg diagnosed Richardson with acute lumbar strain. Dr. Berg advised Richardson to limit herself

---

[28]Dysphoria is a feeling of unpleasantness or discomfort. Stedman's Medical Dictionary, 479.

[29]Edema is an accumulation of watery fluid in cells, tissues, or cavities. Stedman's Medical Dictionary, 489.

to light activity for the next few days, and prescribed Flexeril and Vicodin.[30]  Richardson reported drinking in moderate amounts.  (Tr. 237-38.)

On March 18, 2004, Richardson complained of lower back pain.  She moved stiffly, but did not have any weakness or numbness in the legs, and was able to step onto the exam table.  She had full range of motion, full strength, and full sensation in her lower extremity.  She had limited range of motion in her back, but she was not fully tested.  She was diagnosed with chronic lower back pain, and advised to strengthen her lower back muscles.  The doctor noted she would benefit from physical therapy and weight loss.  (Tr. 241.)

On April 13, 2004, Richardson saw Dr. Timothy R. Borman, D.O., complaining of lower back pain and right thigh pain.  The pain began on March 10, 2004, and since that time, Richardson had severe, constant aching in her back.  The pain radiated to the right side of her lower back, her right buttock, and her posterior right thigh.  The pain was 7/10, but sometimes it was "as severe as 11 on a scale of 0-10." Bending made the pain worse, while lying down provided relief.  The pain in her right buttock and right thigh was a constant, aching pain, with intermittent sharp pain.  The pain ranged from 4/10 to 10/10.  Her right thigh and right calf cramped from time to time, and she could only walk one block at a time.  She had a generalized weakness in her right leg, and her right knee gave way.  She did not have any bowel or bladder difficulties.  To relieve the pain, Richardson had gone to the emergency room, and taken Ibuprofen, Flexeril, and Vicodin.  Her doctors also prescribed Prednisone and physical therapy, but she declined to follow these recommendations.[31]  (Tr. 243.)

_____

[30]Vicodin is a combination narcotic and non-narcotic, and is used to relieve moderate to severe pain.  http://www.webmd.com/drugs. (Last visited August 14, 2008).

[31]Prednisone is a hormone that decreases the immune system's response to various diseases as a way of reducing symptoms such as swelling and allergic-type reactions.  http://www.webmd.com/drugs. (Last visited August 14, 2008).

At the time of the visit, Richardson was taking Celexa, Navane, Seroquel, Levoxyl, Ibuprofen, and Flexeril. In 1991 and 1993, Richardson underwent a laminectomy. She had a prolonged recovery from the surgeries, but felt she obtained a good result after the second surgery. She denied having any back problems until March 2004. She told Dr. Borman that she was quite worried about losing her disability, and asked him to send his notes to Social Security, to help with her case. (Tr. 243-44.)

An examination revealed Richardson was well-developed and overweight. She was oriented to time, place, and person, and her mood and affect were appropriate. She had no adenopathy, no misalignment, defects, tenderness, masses, or effusions.[32] She had normal range of motion, with no pain, crepitation, or contracture. Richardson walked with a gait, but the posture, alignment, and symmetry of her spine were normal. There was a well-healed, non-tender surgical incision in the lumbosacral region. She could tandem walk forward and backward without difficulty. She could rotate her back without pain, but extensions and side-bending were limited. There was no tenderness in her spine, and compression did not aggravate her discomfort. Dr. Borman diagnosed her with lumbar post-laminectomy syndrome. He did not view her as an appropriate surgical candidate, but thought further screening might be appropriate. Dr. Borman did not feel comfortable prescribing narcotic pain medication. (Tr. 245-47.)

On July 6, 2004, Richardson saw Dr. Hoch. She was still experiencing tremendous stress and was waiting to hear from Social Security. Richardson had some trouble sleeping, but thought her sleep disturbance was part of a phase and would correct itself. A mental examination showed she was appropriately dressed and groomed. Her affect was calm and her thought process was organized and linear. She denied any suicidal ideation, but was quite stressed. She was "hanging in there." Her back problems were largely resolved. (Tr. 252.)

---

[32]Adenopathy is swelling or morbid enlargement of the lymph nodes. Stedman's Medical Dictionary, 26. Effusion is the escape of fluid from the blood vessels into the tissues or into a cavity. Id., 491.

On September 7, 2004, Richardson saw Dr. Hoch for a psychiatric assessment.  Richardson had suffered from nightmares, flashbacks, hypervigilance and avoidance, depression, low energy, social withdrawal, poor concentration, anger outbursts, irritability, and suicide ideation. These symptoms were all relatively well-controlled over the past year. "There has been no evidence of mania or psychosis over the past year and she has not brought up issues of [alternate personalities] or dissociation."  Richardson had been under significant stress over the past year, stemming from the end of her disability benefits.  She had been "getting by," but her moods and sleeping patterns were constantly affected by the stress.   The stress had produced full-body rashes. Richardson denied any current, significant alcohol use.  (Tr. 248-51.)

A mental examination showed Richardson was casually dressed, appropriately groomed, polite, and cooperative.  Her speech was within normal limits, and her mood was "up and down."  She was alert and oriented, her cognition was intact, her thought process was organized, she had no suicidal or homicidal ideation, and no psychotic symptoms. Her judgment appeared intact.  Her affect was mildly dysphoric, and she became irritable when discussing the social security process.  Dr. Hoch diagnosed Richardson with borderline personality disorder, based on her dramatic mood reactivity, interpersonal and relationship problems, suicidal gestures and self-injurious behaviors, and marked hostility and aggression.  She also suffered from periods of major depression and post-traumatic stress disorder.   For the previous year, she had been relatively stable on her current medication regimen and her stable relationship.   According to Dr. Hoch, "[t]he greatest risk to her stability is the stress over her social security income appeal.  I think that without that minimal financial security we would be likely to see an increase in behaviors and problems that have lead to hospitalization in the past."  Dr. Hoch assigned Richardson a GAF score of 50, continued her on Citalopram and Thiothixene, prescribed Quetiapine as needed, and

encouraged her to use individual therapy as a way of talking through her stressors.[33]  (Id.)

Sometime after September 2004, Richardson wrote a letter to the ALJ, disputing the decision of the disability hearing officer.  The letter was lucid and easy to read.  When she lived in Missouri, Richardson wrote, she benefitted from a caseworker, group therapy, and anger management classes.  These services were not available to her in Oregon.  She wanted to move back to Missouri, where she could get the care she needed, but was unable to leave the state under the terms of her probation.  (Tr. 279-83.)

Richardson went through phases where she stayed awake for days, cleaning her house, writing poetry, and doing beadwork, before crashing and sleeping twenty to twenty-two hours a day.  During these phases, she cried for no reason, did not bathe, and stayed in her nightgown.  She ate whatever she could find in her pantry.  In September 2004, after Social Security ended her benefits, she swallowed a bottle of anti-depressants and cut her arm.  She viewed the revocation of benefits as "a punishment for learning to cope with my disease."  Had she been in Missouri, she would have gone to the psychiatric ward and received intensive counseling.  In Oregon, she simply had her stomach pumped and was sent home.  The episode "was a cry for help unanswered . . . ."  In some respects, she was doing better, but Richardson still saw herself as a "danger to myself and others."  (Tr. 279-81.)

She had trouble keeping jobs because she imagined co-workers were plotting against her, and she had thoughts of physically assaulting them. She had been fired from every job because of emotional outbursts - and not because of incompetency.  Her severe back pain and carpal tunnel syndrome made holding a job that much more difficult.  She could not stand or walk for any period of time.  She needed to take Flexeril and Ibuprofen every day, just to get around.  "Therefore getting a job as a janitor or say in a [nursery] (where I would have minimal contact with people) is out of the question."  Richardson was able to maintain a level

_____

[33]Quetiapine is an anti-psychotic drug used to treat certain mental or mood conditions, such as bipolar disorder or schizophrenia. http://www.webmd.com/drugs. (Last visited August 14, 2008).

of health by being aware of her physical and emotional limitations, monitoring her stress level, and insulating herself from others. She asked the ALJ not to send her out "among the wolves." She believed her Medicare and disability payments were all that were keeping her from a life on the streets. (Tr. 281-83.)

On November 7, 2004, Richardson saw Dr. Mark Rose, M.D., complaining of back and leg pain. For the last three weeks, she had felt a severe pain in her lower back, radiating down to the right leg. She rated the pain as 10/10. She did not have a fever, chills, neurological changes in her leg, or other symptoms associated with the pain. An examination showed Richardson was alert and oriented, lucid and rational, and tolerating the situation well. She had been given Morphine, but still complained of pain.[34] Her back showed some tenderness to percussion and palpation throughout the region of the lower lumbar spine. She had normal muscle strength and sensation in the lower extremities. There was no evidence of an acute infectious injury, acute bony injury, or acute neurologic injury. Dr. Rose believed that an MRI and CT scan were unnecessary, and that her "condition will improve with conservative therapy and rest." He diagnosed her with lower back pain with sciatica of the right side.[35] She was discharged in stable condition, and instructed to minimize bending, lifting, and sitting. (Tr. 261-63.)

On November 17, 2004, Richardson saw Dr. Borman, complaining of severe pain in the right lower extremity. Richardson's leg pain had subsided in May 2004, but became severe three weeks before this visit, 10/10, and required a visit to the emergency room. At the time of the visit, Richardson noted her pain had settled down, and was 4/10. A physical examination revealed normal muscle strength in the lower extremities. Straight leg raising produced pain in the right lower extremity. Richardson had an antalgic gait, and could heel walk but not

---

[34]Morphine is a drug with a narcotic component, used to treat moderate to severe pain. http://www.webmd.com/drugs. (Last visited August 14, 2008).

[35]Sciatica is pain in the lower back and hip, radiating down the back of the thigh into the leg, usually due to a herniated lumbar disk. Stedman's Medical Dictionary, 1391.

toe walk.[36]  Dr. Borman diagnosed Richardson with post-laminectomy lumbar syndrome, and ordered an MRI.  Depending on the results of the MRI, epidural injections might be appropriate.  (Tr. 254.)

On December 15, 2004, Richardson saw Dr. Borman, complaining of lower back pain and right extremity pain.  Prolonged sitting and standing aggravated her back pain, and she had difficulty walking up and down stairs.  A physical examination showed she had a non-antalgic gait, could heel walk and toe walk, and had normal muscular strength in her lower extremities.  An MRI of her lumbar region revealed marked end plate reactive changes at L5-S1, and spinal stenosis at L4-5 and L5-S1.[37]  Dr. Borman diagnosed her with lumbar post-laminectomy syndrome and prescribed Ibuprofen.  He did not believe epidural injections were necessary, since the leg pain was markedly improved.  (Tr. 264.)

**Testimony at the Hearing**

On May 23, 2005, Richardson testified before the ALJ.  She appeared without an attorney, because she was unable to find a lawyer willing to take her case.  Richardson described her medical and work histories.  Dr. Hoch, a psychiatrist, provided Richardson with her mental healthcare, and Dr. Borman provided treatment for her back.  In 2004, Richardson's landlord hired her and her boyfriend to do some light cleaning in the rental units.  She had to quit because her back prevented her from doing the bending and cleaning the job required.  Richardson lived with her boyfriend, who was permanently disabled.  The couple's only income came from the disability and food stamps they each received.  Richardson received benefits because of her psychiatric condition.  (Tr. 294-302.)

Recently, Richardson had changed her point of view, believing suicide was sinful.  She also stopped self-mutilating because it upset her boyfriend.  (Tr. 302-03.)

---

[36]Antalgic gait refers to a posture or gait assumed in order to avoid or lessen pain.  See Stedman's Medical Dictionary, 65, 91.

[37]Stenosis is the narrowing or constriction of any canal.  Stedman's Medical Dictionary, 1473.

-24-

Richardson spent most of her time sleeping.  But when she was up or high,  she read, wrote poetry, did beadwork, and cleaned her house.  Her poetry had been published six times, but she never made any money from publication.  She had not had a psychotic episode since taking her anti-psychotic medication, but still believed she was bipolar.  She continued to abuse alcohol, drinking a case a day of beer, for the past three years.  Because of the conditions of her probation, Richardson did not report her alcohol abuse to Dr. Hoch.  When she was hospitalized for a kidney infection, she told her emergency room doctors about her alcoholism - but never told her other treating physicians.  She attended some alcohol abuse groups without success.  Richardson noted her skin rash.  Excluding physical symptoms, she believed she was unable to work because of her erratic sleeping patterns, hallucinations, inability to get along with others, and violent temper.  She noted that there were periods where she slept twenty-two hours a day, and would fall asleep in the middle of a hallway if necessary.  (Tr. 303-11, 320-21.)

Richardson had a history of assault and battery.  She assaulted her mother in April 2002, sending her to the hospital, and resulting in a conviction.  Before that, she threw a customer over a second-story balcony.  Another time, she called her manager into the parking lot for a fist fight.  Her probation for the assault on her mother was set to end the following month.  She credited her boyfriend for becoming more stable and straightening out.  She still believed Social Security was punishing her for coping with her disease.  (Tr. 309-11.)

Kay Wise, a vocational expert (VE), testified at the hearing.  The ALJ had Wise assume that Richardson could occasionally lift fifteen pounds, frequently lift less than fifteen pounds, and would need to sit and stand throughout the day, possibly sitting and standing at will.  Wise also assumed that Richardson was capable of simple work, would not interact with the public, and would have limited interaction with co-workers.  Under these circumstances, Richardson could not perform her past relevant work, but could perform other work.  The VE testified that several light-duty jobs involved independent work, without much social interaction, and the ability to sit or stand by option.  In particular, the jobs of photo finisher, garment folder, and table worker fit these

descriptions.  If the VE assumed Richardson could not persist on a day-in, day-out basis, and would miss two or more days of work a month, she would not be able to maintain competitive employment.  (Tr. 311-24.)

The ALJ indicated he was going to order further testing.  (Tr. 321.)

**Testing by Dr. Dietlein**

On July 29, 2005, Dr. Nick Dietlein, Psy. D., completed a psychodiagnostic interview, at the request of Oregon Disability Determination Services.  The focus of the interview was on Richardson's symptoms of bipolar disorder, anger, violence, and alcoholism. Richardson described her social history.  She had been sexually abused by a babysitter and her uncle as a child, and was raised by an abusive mother.  The state removed her from her parent's home, and she lived with her step-brother and his wife for a short time, before moving to Portland, Oregon.  To survive on her own in Portland, Richardson started stripping, "turning tricks," and dealing drugs.  Worried about her safety after dealing drugs, Richardson moved to Hawaii, where she worked as a stripper for ten years.  In Hawaii, she lived with an abusive and alcoholic woman.  In 2002, Richardson moved back to the Northwest, and tried to reconcile with her mother.  In April 2002, she and her mother had the physical fight.  (Tr. 287.)

Richardson obtained a GED, but does not have any further training or education.  She last worked as a bartender in 1991.  She worked at three different bars, but was fired because of emotional outbursts, and for getting into fights, mostly with men.  In 1991, she began receiving disability payments.  Richardson had been diagnosed with diverticulitis and granuloma annulare, a stress-related rash.[38]  She also complained of back problems.  She had a history of using hard drugs, but stopped doing hard drugs because of hallucinations.  At the time of the interview, Richardson smoked a pack a day, and drank between nine and twelve "tall boys" of beer a day, which she had "been doing for years."  She had

---

[38]Granuloma annulare is a chronic or recurrent papular eruption that tends to develop on the distal portions of the extremities and over prominences, although the condition may be generalized.  Stedman's Medical Dictionary, 668.

stomach ulcers and threw up every morning.  She took Ibuprofen for pain, Flexeril for back pain, Celexa for depression, Levoxyl for hypothyroidism, Seroquel and Thiothixene for bipolar disorder, and Mirtazapine and Progesterone.[39]  (Tr. 287-88.)

Richardson had been convicted of assault in 2002, and before that, had spent two years in jail for a different conviction.  She denied having any psychoses, but did have manic periods.  She believed her medications were preventing her hallucinations.  She became anxious about doing things in front of others, and preferred to be by herself.  She frequently had feelings of sadness, depression, and anhedonia.[40]  She had episodes where she pulled out her hair and eyelashes, and picked at her skin.  She threatened people and got into physical altercations as well.  She also noted periods where she felt extremely happy, overly excited, and on top of the world.  In a typical day, Richardson got up at 9:00 a.m., took her medication, and showered.  She watched three to four hours of television a day.  Her favorite activities were drinking, smoking, and writing poetry.  She did not exercise or socialize.  She thought she could walk for five minutes, stand for five minutes, and sit for thirty minutes without getting tired.  She went out once a month to shop and did not clean her house.  She no longer did beadwork, fished, or rode horses.  Her monthly income was the $483 she received from Social Security.  (Tr. 288-89.)

A mental examination showed Richardson was conversational and became less anxious as the interview progressed.  Her emotions were stable and she was upbeat.  She was adequately groomed and looked her age.  She was fully oriented to person, place, time, and location, cooperative, and appeared invested in the interview.  Her speech was normal and there was no indication of psychomotor agitation.  She said she was in a good mood, and her "predominant and stable moods were reflective of an individual who is upbeat."  She did not exhibit any problems with motor functioning.

_____

[39]Mirtazapine is an anti-depressant used to treat depression. Progesterone is a female hormone used to restore normal menstrual periods.  http://www.webmd.com/drugs. (Last visited August 14, 2008).

[40]Anhedonia is the absence of pleasure from the performance of acts that would ordinarily be pleasurable.  Stedman's Medical Dictionary, 85.

Her cognitive functioning appeared to be average and intact, but her judgment for a social situation was inadequate. She denied any suicidal ideation. Dr. Dietlein diagnosed her with bipolar disorder, alcohol dependence, borderline personality disorder, and assigned her a GAF score of 52.[41] (Tr. 289-91.)

In summary, Dr. Dietlein found Richardson's bipolar disorder had been largely under control because of her medications. She still had periods of mania, but they were of relatively short duration and did not pose a threat to herself or others. Her manic symptoms appeared to be represented by flight of ideas and periods of sleeplessness. Dr. Dietlein noted that ending Richardson's alcohol use would help her functioning, but this alone would not allow her to function adequately in a work environment. In Dr. Dietlein's opinion, Richardson's "reported physical limitations in tandem with her mental health issues suggest poor vocational adjustment and performance." Dr. Dietlein found Richardson could understand and remember instructions, and sustain her concentration and attention for short periods. He thought her ability to maintain concentration and attention for longer periods was in question. He found she could engage in social interactions successfully, and adequately manage money. (Tr. 291-92.)

On August 6, 2005, Dr. Dietlein completed a medical source statement. Dr. Dietlein based his conclusions on the interview and mental status exam with Richardson. He found she was completely capable of understanding and remembering short, simple instructions. She had slight limitations in her ability to carry out short, simple instructions, and her ability to understand and remember detailed instructions. She had moderate limitations in her ability to carry out detailed instructions, make judgments on simple work-related decisions, and interact appropriately with co-workers, supervisors, and the public. She had marked limitations in her ability to respond appropriately to

_____

[41]On the GAF scale, a score of 52 represents moderate symptoms (such as flat affect and circumstantial speech, occasional panic attacks), or moderate difficulty in social, occupational, or school functioning (such as few friends, conflicts with peers or co-workers). Diagnostic and Statistical Manual of Mental Disorders, 32-34.

work pressures and changes in the work setting. Dr. Dietlein found Richardson's personality issues would make it difficult for her to interact with others. He found her alcohol dependence limited her ability to follow through on work-related tasks, and likely influenced other issues. He believed her bipolar symptoms would continue to be a major negative influence in her life, but thought she could manage benefits in her own best interest. (Tr. 284-86.)

### III. DECISION OF THE ALJ

The ALJ found Richardson had experienced significant medical improvement related to the ability to perform work activity. Based on Dr. Hoch's statements, the ALJ found bipolar disorder was no longer an appropriate diagnosis. The ALJ also determined that Richardson no longer suffered from post-traumatic stress disorder or borderline personality disorder. These diagnoses had been based on Richardson's history and past medical records, but were not confirmed or established by the present evidence. The ALJ did note, however, that Richardson suffered from a history of laminotomies, obesity, depression, and alcohol dependence, and that these impairments were severe.[42] The ALJ did not believe Richardson's alcohol dependence was in remission; during the hearing, she testified to drinking a case of beer daily. (Tr. 11-17.)

The ALJ accepted the findings by Drs. Anderson and Rethinger, in their respective assessments. The ALJ did not accept the functional limitations Dr. Hoch found. The hospital records did not show any episodes of extended decompensation. Instead, the records indicated Richardson recovered quickly with adequate medication and treatment. Dr. Hoch did not include any statements about Richardson's concentration, persistence, or pace. Meanwhile, Dr. Dietlein found Richardson was able to understand and remember instructions, and sustain concentration and attention. During the hearing, Richardson testified that she did beadwork and wrote publishable poetry. The ALJ therefore found she was

---

[42]A laminotomy is an operation on one or more vertebral plates. Stedman's Medical Dictionary, 836, 839.

-29-

able to concentrate. Richardson's alcohol dependence did not meet any of the listing criteria. (Tr. 17-18.)

The ALJ discounted the opinions of Robert Forshee and David Blanchard, and the October 29, 2003 letter from Drs. Hoch and Neben. Forshee stated that Richardson never brushed her hair, and that she wet herself. Drs. Hoch and Neben noted that Richardson neglected her basic hygiene needs and did not bathe. Yet, during numerous examinations, Richardson was well-groomed, appropriately dressed, and did not have any odor about her. Blanchard's letter, meanwhile, did not address Richardson's ability to work or specific medical conditions. The letter was therefore unhelpful. (Tr. 18-20.)

The ALJ noted that Richardson's symptoms had all been relatively well-controlled over the past year. Dr. Hoch found there had been no evidence of mania or psychosis over the past year, the bipolar disorder was less likely, her depressive symptoms were well-treated, and that she had not complained of alternate personalities or dissociation. Indeed, the ALJ highlighted several instances where Dr. Hoch found Richardson stable on her medication regimen. In addition, Richardson stated her sleep disturbances were only part of a phase, and that they would self-correct. She attributed her sleep disturbances to concern about losing Social Security - and not any medically determinable impairment. Her leg pain settled down and improved. (Tr. 20-23.)

Richardson missed appointments and failed to pursue individual therapy. These two factors detracted from her credibility. She also consistently misrepresented her alcohol consumption. By hiding the extent of her alcohol consumption from her treating physicians, Richardson provided an incomplete picture of her functioning and effectively prevented a valid assessment or treatment of her condition. The ALJ found Richardson had exaggerated her manic episodes in an attempt to hold onto her benefits, claiming to have two- or three-week manic periods, even though her doctors noted her manic symptoms were under control. These factors also detracted from her credibility. (Tr. 23-25.)

The ALJ adopted most of the physical limitations found by Dr. Kehrli, concluding that Richardson had the residual functional capacity

(RFC) to frequently lift ten pounds, occasionally lift fifteen pounds, and to sit, stand, and walk for six hours in an eight-hour workday. The ALJ adopted the mental limitations found by Drs. Anderson and Rethinger, concluding Richardson had the RFC to understand, remember, and carry out simple instructions, and to maintain attention and concentration for simple, repetitive tasks. The ALJ also noted that Richardson did not respond well to criticism, needed help setting realistic goals, needed to avoid contact with the general public, and could handle only limited interaction with co-workers. This assessment supported the finding that Richardson could perform simple, routine, and repetitive work. In determining her RFC, the ALJ evaluated the evidence in the light most favorable to Richardson. Based on this RFC and Richardson's non-exertional limitations, the ALJ relied on testimony from the vocational expert. The VE testified that Richardson could perform the jobs of photo sorter, garment folder, and table worker. In light of this testimony, the ALJ concluded that Richardson had the ability to perform a significant number of jobs in the national economy. Accordingly, she was no longer disabled, and the Commissioner properly terminated benefits. (Tr. 25-28.)

## IV.  GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings are supported by substantial evidence in the record as a whole. Pelkey v. Barnhart, 433 F.3d 575, 577 (8th Cir. 2006). "Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion." Id. In determining whether the evidence is substantial, the court considers evidence that detracts from, as well as supports, the Commissioner's decision. See Prosch v. Apfel, 201 F.3d 1010, 1012 (8th Cir. 2000). As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least 12 months. See 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A). A five-step regulatory framework governs the evaluation of disability in general. See 20 C.F.R. §§ 404.1520, 416.920; see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Fastner v. Barnhart, 324 F.3d 981, 983-84 (8th Cir. 2003). If the Commissioner finds that a claimant is disabled or not disabled at any step, a decision is made and the next step is not reached. 20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4).

In this case, the Commissioner determined that Richardson could not perform her past work, but that she maintained the residual functional capacity (RFC) to perform other work in the national economy.

## V. DISCUSSION

Richardson argues the ALJ's decision is not supported by substantial evidence. Specifically, Richardson argues that the ALJ substituted his opinions for those of her treating physicians and the consultative examiner. She also argues that the ALJ should not have allowed her to testify without counsel. (Doc. 14.)

### Substituted Opinions

Richardson argues the ALJ substituted his opinion for the opinions of Dr. Hoch and Dr. Dietlein. She argues the ALJ selectively chose the favorable aspects of Dr. Hoch's reports and Dr. Dieitlein's consultation, while ignoring their respective conclusions that she was unable to work.

Initial determinations of fact and credibility are the domain of the ALJ. Jones v. Chater, 65 F.3d 102, 104 (8th Cir. 1995). Where crucial to the opinion, these determinations must be set out in the decision, and must be set out with sufficient specificity to enable a reviewing court to decide whether substantial evidence supports the determination. Id.; Taylor ex rel. McKinnies v. Barnhart, 333 F. Supp. 2d 846, 856 (E.D. Mo. 2004). In other words, the ALJ cannot rely solely on favorable evidence

without describing his reasons for discounting the unfavorable evidence. <u>Burks v. Astrue</u>, No. CIV-07-360-D, 2008 WL 1805521, at \*5 (W.D. Okla. Apr. 18, 2008) (adopting report and recommendation of magistrate judge). "The ALJ is not entitled to pick and choose from a medical opinion, using only those parts that are favorable to a finding of nondisability." <u>Robinson v. Barnhart</u>, 366 F.3d 1078, 1083 (10th Cir. 2004) (per curiam).

Looking to the ALJ's opinion, the ALJ discounted the unfavorable evidence, while relying on the favorable evidence. That said, the ALJ addressed and quoted the unfavorable evidence in the decision, and then provided specific reasons for discounting that evidence. According to Dr. Hoch, if Richardson lost her social security benefits, "we would be likely to see an increase in behaviors and problems that have lead to hospitalization in the past." (Tr. 18.) The ALJ discounted this opinion, noting that Richardson's hospital records failed to show any extended episodes of decompensation, and that she recovered quickly with adequate medication and treatment. Richardson's boyfriend and Drs. Hoch and Neben stated that she neglected basic hygiene and would wet herself. The ALJ discounted these opinions, noting that various examiners found Richardson adequately dressed and groomed. Dr. Dietlein believed "Richardson's reported physical limitations in tandem with her mental health issues suggest poor vocational adjustment and performance." (Tr. 25.) The ALJ discounted this opinion, noting that other doctors had already addressed her physical limitations, and that Dr. Dietlein himself concluded that Richardson could understand and remember instructions, sustain concentration and attention, and successfully engage in social interactions. The ALJ adequately described his reasons for discounting the unfavorable evidence.


**Adequate Waiver of counsel**

Richardson argues the ALJ should not have allowed her to testify without counsel.

A Social Security claimant has a statutory right to be represented by counsel at a hearing before an ALJ. <u>Brown v. Shalala</u>, 44 F.3d 931, 934 (11th Cir. 1995) (per curiam). The ALJ must ensure that the claimant is aware of this right. <u>Smith v. Schweiker</u>, 677 F.2d 826, 828 (11th Cir.

1982); <u>Crysler v. Astrue</u>, --- F. Supp. 2d ----, No. 5:05 CV 1132 (LEK/DEP), 2008 WL 2600878, at *7 (N.D.N.Y. June 27, 2008) (adopting report and recommendation of magistrate judge). Once the ALJ has adequately notified the claimant of her right to proceed with a lawyer or representative, the claimant may waive that right. <u>Crysler</u>, 2008 WL 2600878, at *8. For a waiver to be effective, the claimant must be given sufficient information to enable her to decide whether to retain counsel, or whether to proceed pro se. <u>Etayem v. Bowen</u>, No. 88 C 8963, 1989 WL 121271, at *3 (N.D. Ill. Oct. 11, 1989). This information includes an explanation of the valuable role played by an attorney, the possibility of free legal counsel, and the limitation of an attorney's fees to a percentage of any eventual award. <u>Smith</u>, 677 F.2d at 829; <u>Id.</u>

A social security hearing is a non-adversarial proceeding, which requires the ALJ to fully and fairly develop the record. <u>Ellis v. Barnhart</u>, 392 F.3d 988, 994 (8th Cir. 2005). When the claimant appears without the benefit of a lawyer, the ALJ has a heightened duty to fully and fairly develop the record. <u>Wingert v. Bowen</u>, 894 F.2d 296, 298 (8th Cir. 1990); <u>Etayem</u>, 1989 WL 121271, at *4. "This duty requires the ALJ to scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts." <u>Cowart v. Schweiker</u>, 662 F.2d 731, 735 (11th Cir. 1981). This means the ALJ must be diligent to ensure that he elicits both favorable and unfavorable facts and circumstances from the claimant. <u>Id.</u> To justify remand, the claimant must show she was prejudiced by the absence of counsel, but does not have to show she would have received benefits. <u>Brown</u>, 44 F.3d at 935.

During the hearing, the ALJ informed Richardson of her right to an attorney, but little more. The ALJ did not explain the benefits of having a lawyer during the hearing, or how much money a lawyer would expect. <u>See</u> <u>Smith</u>, 677 F.2d at 829. The ALJ also did not make any effort to elicit evidence favorable to Richardson. The ALJ had Richardson's boyfriend take the oath, but did not ask him any questions or solicit any information from him. His "testimony clearly would have been relevant and quite likely would have been favorable" for Richardson. <u>See</u> <u>Cowart</u>, 662 F.2d at 735 (finding ALJ should have questioned claimant's husband about her condition, and remanding for a full and fair

hearing).  The ALJ noted that Dr. Hoch had diagnosed Richardson with major depression, post-traumatic stress disorder, alcohol dependence, and dissociative disorder, but did not ask Richardson any questions about the effects of these impairments.  Instead, the ALJ focused Richardson on a discussion of her bipolar disorder - a disorder Dr. Hoch had ruled out. There is a brief question about Richardson's medications, but no mention of their side-effects.  <u>See</u> <u>id.</u> at 737 (faulting the ALJ for failing to ask about the dosage and side-effects of the claimant's medications). More importantly, there is no mention of Richardson's September 2003 suicide attempt and hospitalization, which happened despite indications she was stable.  <u>See</u> <u>Etayem</u>, 1989 WL 121271, at *4 (noting that the ALJ never mentioned an important operation, and remanding for a full and fair hearing); <u>see also</u> <u>Livingston v. Califano</u>, 614 F.2d 342, 346 (3d Cir. 1980) (remanding after the ALJ "failed to inquire properly into the claimant's strongest argument . . . .").  Finally, the entire hearing, which included testimony from a vocational expert, lasted only seventeen minutes.  <u>See</u> <u>Etayem</u>, 1989 WL 121271, at *4 (noting that the entire hearing lasted only twenty-five minutes and that brevity is an indication of an insufficient hearing).

During the seventeen-minute hearing, the ALJ failed to explain the benefits of having a lawyer, failed to solicit testimony from Richardson's boyfriend, and failed to discuss Richardson's mental impairments and suicide attempt.  Taken together, Richardson was prejudiced by not having a lawyer, and the decision must be remanded for a full and fair hearing.

## VI.  CONCLUSION

For the reasons set forth above, the decision of the Commissioner of Social Security is reversed and remanded under Sentence Four of 42 U.S.C. § 405(g), so that Richardson can have a full and fair hearing on her claim.  An appropriate judgment order is issued herewith.

　　/S/　　David D. Noce　　　　
**UNITED STATES MAGISTRATE JUDGE**

Signed on August 22, 2008.